UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHERYL MINOR,

              Plaintiff,                                 Hon. Janet T. Neff

v.                                                 Case No. 1:10-CV-782

COMMISSIONER OF SOCIAL
SECURITY,

              Defendant.

_____/


**REPORT AND RECOMMENDATION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 46 years of age at the time of the ALJ's decision. (Tr. 19, 108). She successfully completed high school and worked previously as an operations supervisor. (Tr. 18, 142, 152-53).

Plaintiff applied for benefits on May 7, 2007, alleging that she had been disabled since May 4, 2005, due to fibromyalgia, closed head injury, lower back and left leg injury, panic attacks, and post-traumatic stress disorder. (Tr. 108-10, 141). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 73-107). On November 13, 2009, Plaintiff appeared before ALJ Timothy Stueve, with testimony being offered by Plaintiff and vocational expert, James Lozer. (Tr. 25-72). In a written decision dated December 4, 2009, the ALJ determined that Plaintiff was not disabled. (Tr. 11-19). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-5). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On June 27, 2003, Plaintiff participated in an MRI examination of her brain the results of which were "normal." (Tr. 467). On April 13, 2005, Plaintiff participated in an MRI examination of her cervical spine the results of which were "normal." (Tr. 489).

On May 4, 2005, Plaintiff was involved in a motor vehicle accident. (Tr. 433). Plaintiff suffered "no fractures or serious injuries but it aggravated her headache." (Tr. 433). The following day, Plaintiff was examined by Dr. Brown. (Tr. 433). Plaintiff appeared to be "in discomfort" and was "moaning." (Tr. 433). The results of a physical examination were unremarkable. (Tr. 433). Plaintiff was given injections of Demerol[1] and Phenergan.[2] (Tr. 433). The following day, Plaintiff was examined by Dr. Targowski. (Tr. 433). Plaintiff exhibited tenderness and muscle pain, but the results of a neurologic examination were "normal." (Tr. 433).

On May 13, 2005, Plaintiff participated in an MRI examination of her left shoulder the results of which revealed "tendinosis of the supraspinatus and infraspinatus tendons without full thickness tendon tear or tendon retraction." (Tr. 480). On May 13, 2005, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed "mild degenerative changes...with no compromise of the thecal sac or exiting nerve roots." (Tr. 481).

---

[1] Demerol is a narcotic pain reliever "similar to morphine." *See* Demerol, available at http://www.drugs.com/demerol.html (last visited on July 31, 2011).

[2] Phenergan is an antihistamine which is used to treat allergy symptoms, motion sickness, and nausea. *See* Phenergan, available at http://www.drugs.com/phenergan.html (last visited on July 31, 2011). Phenergan is also used as a sedative or sleep aid. *Id.*

On June 9, 2005, Plaintiff was given injections of Stadol[3] and Phenergan.  (Tr. 439). On June 15, 2005, and again on June 21, 2005, Plaintiff received injections of Stadol and Phenergan. (Tr. 440).

On July 3, 2005, Plaintiff reported to the Emergency Room complaining of headache and back pain.  (Tr. 465-66).  The results of a physical examination were unremarkable.  (Tr. 465). Plaintiff was given Stadol and discharged home.  (Tr. 465-66).  On July 10, 2005, Plaintiff reported to the Emergency Room complaining of back pain.  (Tr. 463).  Plaintiff was given Vicodin, Valium, Stadol, and Phenergan.  (Tr. 463).  The following day, Plaintiff again reported to the Emergency Room complaining of back pain.  (Tr. 461-62).  The results of a physical examination were unremarkable and Plaintiff was given injections of Phenergan and Stadol.  (Tr. 461-62).

On July 15, 2005, Plaintiff was examined by Dr. Michael Chafty.  (Tr. 453-55).  The results of a musculoskeletal examination revealed "good range of motion of her cervical spine and lumbar spine as well as her shoulders bilaterally."  (Tr. 454).  Plaintiff exhibited "strong" grip strength and straight leg raising was "negative bilaterally."  (Tr. 454).  Examination of Plaintiff's back revealed "a positive Waddells' sign[4] with very light touch to the upper back."  (Tr. 454).  Dr. Chafty diagnosed Plaintiff with "myofascial back pain."[5]  (Tr. 454).  The doctor informed Plaintiff

---

[3] Stadol is a "synthetically derived opioid" pain medication.  *See* Stadol, available at http://www.drugs.com/pro/stadol.html (last visited on July 31, 2011).

[4] A positive Waddell's sign indicates that an individual is experiencing a non-organic (i.e., psychological or psychosocial) component to her lower back pain.  *See, e.g., A New Sign of Inappropriate Lower Back Pain*, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2504150/ (last visited on July 31, 2011); *Assessment and Management of Acute Low Back Pain*, available at http://www.aafp.org/afp/991115ap/2299.html (last visited on August 4, 2011).

[5] Myofascial pain "is a chronic form of muscle pain."  *See Myofascial Pain Syndrome*, available at http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042 (last visited on August 4, 2011).  Treatment for myofascial pain "typically includes" physical therapy, trigger point injections, nonsteroidal anti-inflammatory medications such as Advil, Motrin, or Aleve, or tricyclic antidepressants.  *Id.*

that "it is going to take some time for her to heal." (Tr. 455). The doctor further noted that he "d[id] not recommend narcotics at this point" and was "some what concerned about [Plaintiff's] reliance on them at this point." (Tr. 455).

On the same day, Plaintiff participated in a consultive examination conducted by Stephen Lazar, Ph.D. (Tr. 810-12). Plaintiff reported that she suffers from "unbearable" headaches and back pain which she rated as 10/10. (Tr. 810). The results of a mental status examination were unremarkable and Dr. Lazar observed that Plaintiff "presents some behaviors, such as rating her pain at a 10, that are frequently seen as exaggerating complaints." (Tr. 811). Plaintiff was diagnosed with pain disorder and her GAF score was rated as 45-50.[6] (Tr. 811).

On July 31, 2005, Plaintiff participated in an MRI examination of her brain the results of which were "normal." (Tr. 234). Plaintiff also participated in an angiogram examination of her head the results of which were "normal." (Tr. 235).

On August 31, 2005, Plaintiff was examined by Dr. Targowski. (Tr. 377). Plaintiff reported experiencing "another migraine headache." (Tr. 377). The results of a neurological examination were "normal." (Tr. 377). Plaintiff was given Stadol and Phenergan and a prescription for Darvocet. (Tr. 377).

On nine separate occasions between August 31, 2005, and November 1, 2005, Plaintiff was given injections of Stadol and Phenergan. (Tr. 374, 376, 395, 398, 400, 402, 405, 408).

---

[6] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 45-50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

On November 5, 2005, Plaintiff reported to the Emergency Room complaining of "back pain and headache." (Tr. 429). Results of a physical examination were unremarkable. (Tr. 429). Plaintiff was administered Dilaudid[7] after which Plaintiff reported "it did not help at all." (Tr. 429). Plaintiff was then administered morphine after which she was discharged home. (Tr. 429). On November 8, 2005, Plaintiff was administered Stadol and Phenergan. (Tr. 411).

Treatment notes dated November 10, 2005, reveal that Plaintiff was "giving a poor effort" during a physical examination. (Tr. 427). On three separate occasions between November 15, 2005, and December 13, 2005, Plaintiff was given injections of Stadol, Phenergan and/or Toradol.[8] (Tr. 375, 413, 417).

On December 19, 2005, Plaintiff participated in a consultive examination conducted by psychiatrist, Dr. Richard Feldstein. (Tr. 388-89). Dr. Feldstein noted that he had previously examined Plaintiff on September 15, 2005. (Tr. 388). The doctor diagnosed Plaintiff with major depressive disorder, cognitive disorder, pain disorder, and closed head injury. (Tr. 389). The doctor further concluded that Plaintiff's injuries "have resulted in serious bodily impairments with consequent significant alterations and limitations in her functional capacity." (Tr. 389).

On February 9, 2006, Plaintiff was examined by Dr. Targowski. (Tr. 379). Plaintiff reported experiencing back pain and headaches. (Tr. 379). The results of a neurological examination were "normal." (Tr. 379). Plaintiff was given Toradol and Phenergan. (Tr. 379).

---

[7]   Dilaudid is a narcotic pain medication "similar to morphine." *See* Dilaudid, available at http://www.drugs.com/dilaudid.html (last visited on July 31, 2011).

[8]   Toradol is a nonsteroidal anti-inflammatory pain medication. *See* Toradol, available at http://www.drugs.com/toradol.html (last visited on July 31, 2011).

On February 16, 2006, Plaintiff participated in a neuropsychological evaluation conducted by Bradley Sewick, Ph.D. (Tr. 614-23). Plaintiff reported that she was experiencing head and back pain which rated 10/10, as well as blurred and double vision. (Tr. 618-19). Plaintiff also reported that she experienced difficulty "following conversations and understanding others" as well as "trouble with reasoning." (Tr. 619). Testing indicated that Plaintiff was exhibiting "some enhancement of existing problems." (Tr. 621). Plaintiff was diagnosed with cognitive disorder, pain disorder, and depressive disorder with panic attacks. (Tr. 622). Dr. Sewick concluded that Plaintiff "is not capable of working at this time" and "has trouble in even handling routine chores within the home and requires assistance from others." (Tr. 623).

On February 19, 2006, Plaintiff was examined by Dr. Burhans. (Tr. 381). Plaintiff reported experiencing headaches and back pain. (Tr. 381). Plaintiff was "in no apparent distress" and the results of a physical examination were unremarkable. (Tr. 381). Plaintiff was given Stadol and Phenergan. (Tr. 381). On March 14, 2006, and again on March 23, 2006, Plaintiff received injections of Toradol and Phenergan from Dr. Garb Ruoff. (Tr. 382).

On March 21, 2006, Plaintiff was examined by Dr. Grant Hyatt. (Tr. 824-31). Plaintiff reported experiencing "constant daily headaches, which she characterized as off the scale." (Tr. 825-26). Plaintiff reported that "due to the headaches, I can't function, I can't sleep." (Tr. 826).

The doctor reported that Plaintiff "brought a cane to the office with her, but was able to stand and walk without the use of that assistive device." (Tr. 827). With respect to his examination of Plaintiff's neck, Dr. Hyatt reported the following:

> Examination of the neck revealed no structural or postural deformity present. Cervical lordosis was normally preserved. There was no soft tissue swelling, hypertonicity, or paracervical muscle spasm with the

8

patient seated at rest.  Paracervical muscle mass and tone were normal for the patient's age.  She reported tenderness to palpation along the enter left side of the neck, exhibiting hypersensitivity to light touch in that area, with the same hypersensitivity extending across the left superior trapezius and all aspects of the left shoulder.  I later utilized some distraction techniques as I was assessing range of motion of the cervical spine and, at that time, the same pressure in the same area did not elicit any complaints of pain.  In terms of range of motion of the cervical spine, no limitations were encountered.  Range of motion of the cervical spine was unrestricted through the extremes of flexion, extension, lateral tilt, and rotation.   There was no reactive paracervical muscle spasm, reactive hypertonicity, or myofascial restriction detected in association with neck movement.  Foraminal compression test was negative, bilaterally.

(Tr. 827).

With respect to his examination of Plaintiff's upper extremity, Dr. Hyatt observed the following:

Examination of the upper extremities revealed no structural deformity present, and the passive range of motion of all major joints was unrestricted.  Discomfort was described in association with all left shoulder movements and all left elbow movements.  There was no atrophy in the upper extremities...sensory status throughout the upper extremities was functionally intact.   However, patient provided minimal effort in strength testing throughout both upper and both lower extremities.  Maximal effort provided was no greater than two considering five as normal.  If this accurately represented the patient's maximal muscular output, she would be incapable of independent stance or ambulation.

The patient postured holding both shoulders level.  Sulcus sign[9] was negative.  There was no swelling, effusion, hyperthermia, or erythema involving either shoulder.  The patient reported diffuse tenderness along the posterior, superior, lateral, and anterior aspects of the left

---

[9]  Sulcus sign "is an examination to determine the extent and/or presence of inferior instability of the glenohumeral joint." *See Orthopedic Assessment Methods, Shoulder - Sulcus Sign,* available at http://orthoassessment.blogspot.com/2007/01/shoulder-sulcus-sign.html (last visited on August 4, 2011).  The glenohumeral joint is the shoulder's "ball-and-socket joint that allows for the arm to move in a circular motion as well as movement of the arm towards and away from the body." *See Biology of the Shoulder, Glenohumeral Joint,* available at http://biomed.brown.edu/Courses/BI108/BI108_2004_Groups/Group01/bioghj.htm (last visited on August 4, 2011).

9

shoulder...without any specific localization.  There was no crepitus, clicking, or snapping identified in association with shoulder movements, bilaterally.  Unfortunately, provocative testing was of no clinical benefit in this situation.  Ms. Minor reported pain in response to every potential provocative movement...as a result of the generalized non-specific and non-focal responses to the full battery of diagnostic testing, it rendered the results of the testing invalid.

Both elbow and radiocapitellar joints were stable.  There was no swelling, effusion, hyperthermia, or erythema involving either elbow.  The patient reported tenderness to palpation along the anterior, posterior, medial, and lateral aspects of the left elbow, without specific localization.  There was no crepitus, clicking, or snapping identified in association with movements of the left elbow or radiocapitellar joint.  Tendon function across both elbows was intact, with no evidence of tendon subluxation or clinical evidence of tendon irritability.  Provocative testing was, again, of no probative value, with the patient reporting left elbow pain in response to all provocative maneuvers, such as elbow extension and flexion and forearm supination and pronation, all of which were met with complaints of diffuse and global elbow pain.

(Tr. 827-28).

An examination of Plaintiff's back revealed the following:

Examination of the back revealed no structural or postural deformity present.  Thoracic kyphosis and lumbar lordosis were normally preserved.  There was no soft tissue swelling, hypertonicity, or paraspinal muscle spasm with the patient standing at rest. Paralumbar muscle mass and tone were unremarkable for the patient's age.  She reported tenderness to palpation over both paraspinal columns, extending from level L3 to level S2.  It was not possible to evaluate range of motion of the back.  On direct assessment of range of motion, the patient would not move the back in any plane of motion.  However, she assumed a normally upright position in a chair and on the examining table, contradicting the lack of mobility otherwise suggested.  Due to the lack of available range of motion, it was not possible to otherwise assess biomechanical status of the back.

Straight leg raising was negative, bilaterally.  Patrick's test[10] was
negative, bilaterally.

(Tr. 828-29).

With respect to his examination of Plaintiff's lower extremities, Dr. Hyatt reported

the following:

Examination of the lower extremities revealed no structural deformity
present, and the passive range of motion of all major joints was
unrestricted...sensory status in the lower extremities was functionally
intact.   Manual muscle testing revealed symmetric strength
throughout the lower extremities, encountering the same difficulty as
previously noted in assessment of the upper extremity in terms of
suboptimal effort.

(Tr. 829).

As part of this examination, x-rays of Plaintiff's left elbow were taken.  (Tr. 830).

These x-rays revealed "maintenance of normal skeletal architecture" with "no evidence of recent or

remote fracture or degenerative changes" and "no [evidence of] significant osseous, articular, or soft

tissues abnormalities."  (Tr. 830).

Dr. Hyatt concluded that this was an "objectively unremarkable examination of the

neck and cervical spine."  (Tr. 830).  The doctor determined that "the only orthopedic condition,

which might serve as an indication for restrictions, is status of the left shoulder."  (Tr. 830).  In this

respect, the doctor concluded that "it would be reasonable that the patient avoid exposure to

extensive or repetitive overhead use of the left upper extremity or exposure to forceful or repetitive

pushing or pulling with use of the left upper extremity, which might exacerbate the tendon

inflamation suggested by the MRI."  (Tr. 830).  Dr. Hyatt further noted that "a course of physical

---

[10] Patrick's test is used to determine whether a patient suffers from arthritis of the hip joint.  This test is also referred to as Fabere's sign.  J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* P-81 (Matthew Bender) (1996).

therapy would be most appropriate with regard to management of the left shoulder condition." (Tr. 830).

> Dr. Hyatt concluded his report with the following:
>
> My greatest concern, based upon today's physical examination, is that the patient appears to be over medicated. She was visibly sedated in her words and actions during the course of today's interview and examination. The adverse effects of narcotic analgesics can significantly hamper the patient's response to appropriate medical care of any musculoskeletal condition, as well as significantly impair her functional capacity.

(Tr. 830-31).

On March 24, 2006, Dr. Yasmeen Ahmad concluded that Plaintiff's "headaches are migraine headaches, which are transformed into analgesic rebound with narcotics dependence." (Tr. 834). On March 25, 2006, Plaintiff reported to Dr. Burhans who administered injections of Toradol and Phenergan. (Tr. 383).

On April 4, 2006, Plaintiff was examined by Dr. Ruoff. (Tr. 345). Plaintiff reported experiencing head and neck pain. (Tr. 345). The doctor characterized Plaintiff's pain as "myofascial" and administered Toradol and Phenergan. (Tr. 345). On six separate occasions between April 11, 2006, and May 16, 2006, Plaintiff received injections of Toradol and Phenergan from Dr. Ruoff. (Tr. 346, 348, 384-86).

On May 26, 2006, Plaintiff reported to the Emergency Room complaining of "headache, neck and back discomfort." (Tr. 247-48). The results of the physical examination were unremarkable and there were "no neurologic symptoms that would be concerning." (Tr. 247-48). Plaintiff was provided Dilaudid and Valium after which she was discharged. (Tr. 248).

12

On eight separate occasions between May 30, 2006, and August 1, 2006, Plaintiff received injections of Toradol and Phenergan from Dr. Ruoff. (Tr. 350-60). On August 7, 2006, Plaintiff reported to the Emergency Room complaining of "10 out of 10 chest pain." (Tr. 256). X-rays of Plaintiff's chest were "normal" and the results of a stress test were "normal." (Tr. 255-56).

On August 25, 2006, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "straightening of the normal lordotic curvature suggesting cervical paraspinal muscle spasms; otherwise, essentially unremarkable MRI of the cervical spine." (Tr. 356-57).

Treatment notes dated September 18, 2006 indicate that Plaintiff was consuming more Vicodin than she was prescribed. (Tr. 314). Treatment notes, dated October 3, 2006, indicate that Plaintiff was experiencing "rebound headache[s]." (Tr. 315). On November 10, 2006, Plaintiff participated in an electroencephalogram examination the results of which were "normal." (Tr. 261).

On December 23, 2006, Plaintiff participated in an "angiogram of the intra cranial arteries" the results of which were "essentially unremarkable." (Tr. 646). The same day, Plaintiff also participated in an "angiogram of the extra cranial arteries" the results of which were "normal." (Tr. 648). An MRI examination of Plaintiff's brain, performed the same day, was "essentially unremarkable." (Tr. 649-50). The same day, Plaintiff also participated in an MRI examination of her cervical spine the results of which revealed: (1) "mild" disk bulges at C5-C6 and C6-C7 "without neural compromise;" and (2) "straightening of the normal lordotic curvature suggesting cervical paraspinal muscle spasm." (Tr. 651-52).

On December 28, 2006, Plaintiff reported to the Emergency Room complaining of "right lower quadrant pain." (Tr. 303-04). The results of a physical examination were unremarkable

13

as were the results of a CT scan of her abdomen and pelvis.  (Tr. 303-05).  Plaintiff was provided morphine.  (Tr. 303).

On April 18, 2007, Plaintiff reported to the Emergency Room complaining of a headache.  (Tr. 275-76).  The results of a physical exam were unremarkable and the results of a CT scan of her head were "normal."  (Tr. 275-76).  Plaintiff was provided Dilaudid, Toradol, and Phenergan after which she was discharged home.  (Tr. 276).

On May 28, 2007, Plaintiff reported to the Emergency Room reporting that "my body aches all over from my neck down into my left leg."  (Tr. 282).  The results of an examination were unremarkable.  (Tr. 286).  Plaintiff was given Dilaudid and discharged with prescriptions for Oxycodone,[11] Percocet,[12] and Xanax.  (Tr. 288-90).

On January 14, 2009, Plaintiff was examined by Dr. Targowski.  (Tr. 752).  Plaintiff reported experiencing back pain and headaches.  (Tr. 752).  The results of a neurological examination were "normal."  (Tr. 752).  Plaintiff was given Demerol and Phenergan.  (Tr. 752).

On January 23, 2009, Plaintiff was examined by Dr. Targowski.  (Tr. 749).  Plaintiff reported that she recently fell and injured her left ankle and that "she feels very bad."  (Tr. 749).  The doctor reported that Plaintiff "was demanding to have Demerol" and stated that "I'm paying for it so I should get it."  (Tr. 749).  Plaintiff was given Demerol and Phenergan.  (Tr. 749).

On February 19, 2009, Plaintiff was examined by Dr. Green.  (Tr. 748).  Plaintiff reported experiencing back pain and headaches.  (Tr. 748).  Plaintiff was "in no apparent distress"

---

[11]  Oxycodone is a narcotic pain medication "similar to morphine."  *See* Oxycodone, available at http://www.drugs.com/oxycodone.html (last visited on July 31, 2011).

[12]  Percocet contains a combination of oxycodone and acetaminophen.  *See* Percocet, available at http://www.drugs.com/percocet.html (last visited on July 31, 2011).

and the results of a physical examination were unremarkable. (Tr. 748). The doctor instructed Plaintiff that he "could not give her Demerol and Phenergan." (Tr. 748). The doctor instead "offered her Toradol and she declined that." (Tr. 748).

On April 21, 2009, Plaintiff was examined by Dr. Ruoff. (Tr. 746). Plaintiff reported experiencing right upper quadrant pain. (Tr. 746). The doctor reported that "the pain is out of proportion to the physical findings." (Tr. 746). Plaintiff was given Toradol and Demerol. (Tr. 746). On four separate occasions between April 28, 2009, and May 28, 2009, Plaintiff received from Dr. Ruoff injections of Demerol and Phenergan. (Tr. 742-45).

On June 13, 2009, Plaintiff was examined by Dr. Targowski. (Tr. 740). Plaintiff reported she was experiencing abdominal pain. (Tr. 740). Plaintiff was given Demerol and Phenergan. (Tr. 740). On three occasions between June 16, 2009, and June 26, 2009, Plaintiff was given injections of Demerol and Phenergan. (Tr. 735-39).

On November 11, 2009, Dr. Ruoff completed a report regarding Plaintiff's functional capacity. (Tr. 729-33). The doctor reported that Plaintiff can "rarely" lift less than 10 pounds and can "never" lift more than 10 pounds. (Tr. 732). The doctor reported that Plaintiff "must" use a cane or other assisted device when standing or walking. (Tr. 731-32). The doctor reported that Plaintiff can sit for one hour, stand for 30 minutes, and is incapable of walking even one city block. (Tr. 730-31). The doctor reported that during an eight hour workday, Plaintiff can sit for less than two hours and stand/walk for less than two hours. (Tr. 731). Dr. Ruoff concluded that Plaintiff was "incapable of even low stress jobs." (Tr. 730).

## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffers from (1) fibromyalgia, (2) left shoulder tendonitis, (3) migraines, (4) chronic pain disorder, (5) anemia, (6) depression, and (7) cognitive disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13-15). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 18-19). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[13] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

---

[13] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) Plaintiff can occasionally lift 20 pounds and frequently lift 10 pounds; (2) during an 8-hour workday with normal breaks, she can sit for 6 hours and stand/walk for 6 hours; (3) she can only occasionally climb, balance, stoop, kneel, crouch, or crawl; (4) she is limited to simple, repetitive, and routine tasks in a work environment free of fast paced production requirements; (5) she can perform only simple work-related decisions with few, if any, work pace changes; (6) she is able to understand, carry-out, and remember only simple instructions; (7) she can respond appropriately to supervisors, co-workers, and usual work situations; (8) she can deal with changes in a routine work setting on a sustained basis; and (9) she can only occasionally interact with the general public. (Tr. 15). After reviewing

the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert James Lozer.

The vocational expert testified that there existed approximately 21,000 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 63-64). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The vocational expert further testified that if Plaintiff were further limited in that she could lift no more than 10 pounds occasionally and could stand/walk for only two hours daily, there still existed approximately 5,000 jobs that she could perform. (Tr. 64-65).

18

a.      The ALJ Properly Evaluated the Medical Evidence

Plaintiff asserts a single issue on appeal, that the ALJ failed to properly assess the opinions of several of her care providers.  The ALJ's assessment of each care provider in question is discussed separately below.

1.      Dr. Ruoff

As noted above, Dr. Ruoff reported that Plaintiff can "rarely" lift less than 10 pounds and can "never" lift more than 10 pounds.  The doctor reported that Plaintiff "must" use a cane or other assisted device when standing or walking.  Dr. Ruoff also reported that Plaintiff can only sit for 60 minutes, stand for 30 minutes, and is incapable of walking even one city block.  The doctor reported that during an eight hour workday, Plaintiff can sit for less than two hours and stand/walk for less than two hours.  Dr. Ruoff concluded that Plaintiff was "incapable of even low stress jobs." The ALJ concluded that he "cannot give much weight" to Dr. Ruoff's opinion.  (Tr. 17).  Plaintiff asserts that because Dr. Ruoff was her treating physician, the ALJ was required to accord controlling weight to his opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

19

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544.  In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544.  The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).  Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

The ALJ determined that Dr. Ruoff's opinion was entitled to little weight because it was based on Plaintiff's subjective complaints, which enjoy very little support in the record.  (Tr. 17).  The doctor's treatment notes do not support his opinion.  As detailed above, the results of

20

objective medical testing and numerous physical examinations fail to support the opinion that Plaintiff is impaired to an extent beyond that recognized by the ALJ. Moreover, as previously noted, Plaintiff was often observed giving "minimal effort" during examinations and exaggerating her symptoms. In sum, substantial evidence supports the ALJ's decision to afford less than controlling weight to Dr. Ruoff's opinion.

       2.     Dr. Sewick

As previously noted, following a February 16, 2006 consultive examination, Bradley Sewick, Ph.D., concluded that Plaintiff "is not capable of working."

First, it appears that Dr. Sewick examined Plaintiff on only one occasion. As is well recognized, an opinion expressed by a care provider who has, at the time the opinion in question is offered, examined the claimant only once is not entitled to any deference. The treating physician doctrine "is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once." *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 506 (6th Cir. 2006). When assessing whether an opinion from a care provider is entitled to deference, the question is not whether the care provider later established a "treating physician" relationship with the claimant, but instead whether such relationship existed as of the date the opinion in question was rendered. As the Sixth Circuit has observed:

> But the relevant inquiry is not whether [the doctor] might have become a treating physician in the future if [the claimant] had visited him again. The question is whether [the doctor] had the ongoing relationship with [the claimant] to qualify as a treating physician *at the time he rendered his opinion*.

*Id.*

Accordingly, "a single visit [to a care provider] does not constitute an ongoing treatment relationship." *Id.* Moreover, "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." *Id.* at 506-07.

Thus, Dr. Sewick's opinion is not entitled to any deference or special consideration. The ALJ properly decided to disregard this particular opinion as it is inconsistent with the medical evidence detailed above. Moreover, Dr. Sewick's conclusions are based to a significant extent on Plaintiff's subjective allegations which as previously noted are entitled to very little weight. Even Dr. Sewick reported that Plaintiff was exhibiting "some enhancement of existing problems." Accordingly, the Court discerns no error in the ALJ's decision to afford little weight to Dr. Sewick's opinion.

3.      Dr. Lazar

As noted above, Dr. Lazar examined Plaintiff on a single occasion, after which he diagnosed Plaintiff with pain disorder and rated her GAF score as 45-50. Plaintiff asserts that the ALJ failed to properly consider the results of this examination. Specifically, Plaintiff asserts that a GAF score of 45-50 establishes her disability.

First, because Dr. Lazar examined Plaintiff on only one occasion his opinion is entitled to no special deference or consideration. Moreover, as the Sixth Circuit has recognized, a GAF score "may help an ALJ assess mental RFC, but it is not raw medical data." *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 503 n.7 (6th Cir., Feb. 9, 2006). It is simply

22

"a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *Oliver v. Commissioner of Social Security*, 415 Fed. Appx. 681, 684 (6th Cir., Mar. 17, 2011). Accordingly, the ALJ is not required "to put stock in a GAF score in the first place." *Kornecky*, 167 Fed. Appx. at 511 (citing *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002)). More importantly, however, Plaintiff's assertion that these GAF scores reveal that she is suffering "serious symptoms" or a "serious impairment" is not supported by the evidence. As Dr. Lazar himself recognized, Plaintiff was "exaggerating [her] complaints." Accordingly, the Court discerns no error in the ALJ's assessment of Dr. Lazar's findings.

### 4.    Dr. Feldstein

As noted above, Plaintiff was examined by Dr. Feldstein on two occasions between September 15, 2005, and December 19, 2005. Following this latter examination, Dr. Feldstein reported that Plaintiff's injuries "have resulted in serious bodily impairments with consequent significant alterations and limitations in her functional capacity." (Tr. 389).

Even assuming that Dr. Feldstein is considered to be a treating source whose opinion is entitled to deference, the doctor did not express any opinion which the ALJ disregarded. Dr. Feldstein did not articulate any specific functional limitations that are inconsistent with the ALJ's RFC determination. Instead, the doctor simply stated that Plaintiff's injuries resulted in limitations to her functional capacity, something fully recognized by the ALJ in his decision. The Court discerns no error in the ALJ's evaluation of Dr. Feldstein's observations.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: August 17, 2011

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge